IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:20CR112 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | |
| | ) | |
| ALLEN MARTIN KENNA, | ) | RESPONSE TO DEFENDANT'S MOTION |
| | ) | FOR MODIFICATION OF DETENTION |
| Defendant. | ) | ORDER |

Now comes the United States of America, by and through the undersigned counsel and respectfully submits the following Response to Defendant Allen M. Kenna's ("the Defendant") Motion for Immediate Release Due to Danger from Coronavirus.  (R. 22: Motion for Immediate Release Due to Danger from Coronavirus, PageID 66-75).  For the reasons stated herein, the United States of America requests that this Court deny Defendant's Motion.

I. **PROCEDURAL HISTORY**

On February 12, 2020, a federal grand jury returned an indictment charging the Defendant with the following:

- Count 1: Attempted Use of an Explosive Device to Damage or Destroy a Building Used in Interstate Commerce in violation of 18 U.S.C. § 8441(i); and
- Count 2: Threatening Communications in violation of 18 U.S.C. § 87541(c).

(R. 5: Indictment, PageID 29-30).  These charges carry the rebuttable presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community."  18 U.S.C. § 3142(e)(3)(C).

The Defendant now brings a Motion for Immediate Release Due to Danger from Coronavirus and asks that Judge Gaughan's detention order be rescinded.  However, in his

motion, the Defendant fails to allege any new facts that bear on the danger he presents to the community. Instead, he asks this Court release him because of the possibility that he may become infected with COVID-19 while incarcerated and suggests that safety protocols ordered by the State of Ohio to close schools adequately minimize his risk to the community. Because the Defendant has not presented any evidence indicating that he is not a threat to the community if released, this Court should deny his motion to revoke the detention order.

## II.     ARGUMENT

### 1. Presumption in Favor of Detention

The Bail Reform Act requires courts to detain a defendant pending trial when "no condition or combination of conditions will reasonably assure the appearance of the person . . . and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1); see also, United States v. Ferranti, 66 F.3d 540, 543-44 (2d Cir. 1995) (either flight risk or danger to the community supports detention; proof of both is unnecessary). Risk of flight must be proved by a preponderance of the evidence, while dangerousness must be shown by clear and convincing evidence. United States v. Hinton, 113 F. App'x 76, 77 (6th Cir. 2004).

In addition to this standard, there is a "rebuttable presumption" that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community, i.e., a presumption that the defendant should be detained, when there is probable cause to believe that the defendant has committed an offense under the definition of Federal crimes of terrorism pursuant to 18 USC § 2332b(g)(5). 18 USC § 3142(g)(1). An indictment alleging that the Defendant committed one of the qualifying offenses is sufficient to establish the probable cause that triggers the presumption of detention. See United States v. Hazime, 762 F.2d 34, 37 (6th Cir. 1985) (citing Gerstein v. Pugh, 420 U.S.

103 (1975)).  The Defendant is charged with a violation of 18 USC § 844(i) which falls squarely and unequivocally within the definition of a Federal crime of terrorism, and thus, the presumption applies.

The presumption of detention imposes on the defendant only a burden of production to produce some evidence that he does not pose a danger to the community or a risk of flight. United States v. Stone, 608 F.3d 939, 945 (6th Cir. 2010).  The defendant's burden of production is not heavy, but he must introduce at least some evidence that he is not a flight risk or a danger to the community.  Id.; see also United States v. Rodriguez, 950 F.2d 85, 88 (2d Cir. 1991).  To be sure, the Defendant has produced *no* evidence his danger to the community has decreased, instead he offers only the most cynical and antisocial counter that, because his preferred target has been taken away by state-mandated safety protocols, he is no longer a danger.  This Court's analysis should end here, as the presumption has not been overcome, and 18 U.S.C. § 3142(e)(1) dictates that the Court "shall order the detention of the person before trial."

Even if the Defendant had presented evidence to overcome the presumption either at a detention hearing or in his instant motion, the presumption does not vanish simply because a defendant comes forward with evidence to rebut it.  Rather, "the rebutted presumption retains evidentiary weight."  United States v. Dillon, 938 F.2d 1412, 1416 (1st Cir. 1991); United States v. Gray, 20 F. App'x 473, 475 (6th Cir. 2001).  The Stone Court explained that this is a reflection of "Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial."  Stone, 608 F.3d at 945.  Therefore, the defendant "should present all the special features of his case that take it outside the congressional paradigm."  Id. at 946 (internal citations and quotations omitted).  The Defendant has failed to present any, let

alone, sufficient evidence to rebut the presumption; thus, the Defendant should remain detained pending trial.

  2. <u>The Factors Weigh in Favor of Detention</u>

If a defendant submits evidence to rebut the presumption – which the Defendant has failed to do in this case – the district court must consider four factors to determine whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community: (1) the nature and circumstances of the crime charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that defendant's release would pose. 18 U.S.C. § 3142(g).

First, the nature and circumstances of the offense support that the defendant presents a danger to the community.  Section 3142 instructs that the Court should consider whether the offense charged involves a Federal crime of terrorism.  18 U.S.C. § 3142(g)(1).  Indeed, 18 U.S.C. § 844(i), attempted use of explosives to destroy a building used in interstate commerce, in this case the Cuyahoga Falls High School, involves a crime defined as a Federal crime of terrorism.

Second, the weight of the evidence supports detaining the defendant.  This factor relates to the weight of the evidence of dangerousness, not to the weight of the evidence of the defendant's guilt.  <u>Stone</u>, 608 F.3d at 948.  Here, the evidence is that the Defendant acquired manuals detailing how to construct improvised explosive devices, and in fact had collected most of the required components to do so.  It must be noted that one manual, published by Al Qaeda contained directions for constructing an improvised explosive device using materials in "the kitchen of your mom," while another was an Army manual instructing how to use materials

found in homes, towns, and jobsites to create explosives.  The Defendant also created videos reconnoitering the high school, with students in it.  This behavior clearly demonstrates a significant danger to the community that cannot be minimized or dismissed cavalierly.

Third, the Defendant's history and characteristics also weigh in favor of continued detention.  In assessing whether this factor weighs in favor of detention, the statute identifies eleven nonexclusive areas for the court's consideration. Those areas are (a) the defendant's character; (b) his physical and mental state; (c) his family ties; (d) his employment; (e) his financial resources; (f) the length of residence in the community/community ties; (g) past conduct; (h) history relating to drug or alcohol abuse; (i) criminal history; (j) record concerning appearance at court proceedings; and (k) whether, at the time of the current offense or arrest, the person was on probation, parole, or other release pending trial, sentencing, appeal, or completion of a sentence. 18 U.S.C. § 3142(g)(3).

Here, the Defendant was minimally employed and clearly, however he resented and disliked his peer group and community.  He lived at home with approximately 8 to 10 other family members, most of them younger siblings, and had minimal financial resources.  There are few factors which auger in the Defendant's favor, and none certainly which compel an overcoming of the presumption for detention.

    3.  <u>COVID-19 Has No Bearing on the Defendant's Dangerousness or Risk of Flight</u>

The Defendant's motion makes a general reference to a potential COVID-19 outbreak and offers as support wildly irrelevant and histrionic sources of evidence.  He offers news stories about Chinese and Iranian prisons at various points in time, blanket declarations made by online

magazines not specific to the Defendant's current state, and to an anonymous video taken in an unidentified location made by a person with clear biases and no factual support. However, he fails to articulate how that situation makes him any less of a danger to the community.

Furthermore, on April 6, 2020, and again on April 8, 2020, representatives from the U.S. Attorney's Office received communication from the Health Services Administrator at the Northeast Ohio Correctional Center, (NOCC), where the Defendant is housed, and learned that there are no confirmed or suspected cases of COVID-19 at NOCC. *See* Ohio Department of Rehabilitation and Corrections, Daily COVID-19 Report at: https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-08-2020%20%201614-1.pdf. (Showing COVID-19 Daily Inmate testing, as to Northeast Ohio Correction Center showing: -0- Units in quarantine; -0- inmates in quarantine; and -0- Inmates testing positive for COVID-19, as of 04.08.2020). Nor does Defendant allege anything to the contrary. Therefore, the Defendant's concerns of contracting COVID-19 are not ripe, even if they were relevant to the inquiry regarding the danger he poses in the community.

Instead, the Defendant conflates legal standards, arguing that COVID-19 presents a change in circumstances warranting a reconsideration a previous detention waiver. The Defendant has failed to show that the change "has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." 18 U.S.C. § 3142(f). He instead relies on a video allegedly smuggled out of an unnamed and unidentified federal facility by an anonymous person identified only as "@Balleralert." In addition to providing no information about from where he was filming, @Balleralert provides no academic or medical bona fides from which he draws his conclusions, nor does he provide any supporting information or context for

the Kafka-esque horrorscape he hysterically describes. Likewise, the Defendant offers a snippet of an order directing the release of a defendant with an auto-immune deficiency disorder from over 26 years ago. The basis for release in that case was the terminal state of the defendant's illness. In the instant case, the Defendant does not claim to be infected with COVID-19, the auto-immune disease from the case he cites, or that he was personally subjected to the conditions alleged by @Balleralert, let alone those mentioned as being present in the Chinese and Iranian prisons to which he makes reference.

    4. <u>Precautionary Measures Have Been Instituted By The Bureau of Prisons</u>

Even if the Court determines that it is appropriate to reopen the issue of detention, the Defendant's concern about possibly getting sick is not a valid basis for release. The Defendant claims that he is at risk of contracting COVID-19 while he is incarcerated, but significant steps have been taken to protect him and other inmates. On April 1, 2020, the Bureau of Prisons ("BOP") implemented Phase Five of its COVID-19 Action Plan "to further mitigate the exposure and spread of COVID-19."[1] The plan includes the following procedures:

- For a 14-day period, inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus. This modification to our action plan is based on health concerns, not disruptive inmate behavior.
- • During this time, to the extent practicable, inmates should still have access to programs and services that are offered under normal operating procedures, such as mental health treatment and education.
- • In addition, the Bureau is coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time.
- • After 14 days, this decision will be reevaluated and a decision made as to whether or not to return to modified operations.
- • Limited group gathering will be afforded to the extent practical to facilitate commissary, laundry, showers, telephone, and Trust Fund Limited Inmate Computer System (TRULINCS) access.

---

[1] https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

Additionally, prior to these most recent steps, the BOP had previously imposed preventative measures throughout the country:

> On March 26, 2020, the BOP implemented revised preventative measures for all institutions. The agency updated its quarantine and isolation procedures to require all newly admitted inmates to BOP, whether in a sustained community transition area or not, be assessed using a screening tool and temperature check. This includes all new intakes, detainees, commitments, writ returns from judicial proceedings, and parole violators, regardless of their method of arrival. Asymptomatic inmates are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.[2]

5. <u>Comprehensive Precautionary Measures Have Been Instituted By The U.S. Marshals Service</u>

Likewise, the U.S. Marshals Service has established the following set of precautionary measures to limit the risk of COVID-19 transmission among prisoners, staff, and court personnel:

**PRISONER MANAGEMENT:  GUIDANCE FOR USMS STAFF**
- **Cellblock screening of arrestees on intake** *(See Attachment A: COVID-19 Symptom Screening)*
    - Upon intake, arrestees should be screened for flu-like symptoms, *particularly fever* (use a forehead no touch thermometer, if available)*, cough and difficulty breathing*.
    - Arrestees presenting from another agency with flu-like symptoms should not be accepted from the arresting agent until they have been examined and medically cleared.
    - If flu-like symptoms are present and personnel need to be within 6 feet of the arrestee:
        - **Personnel** (follow the below order of the bulleted list to don protective gear; reverse to take off except for the N-95 mask which comes off last)**:**
            - **Thorough handwashing** is required before and after prisoner handling
            - Use a **disposable isolation gown or single use/disposable coveralls\***
        *\*Note:*  If unable to wear a disposable gown or coveralls, ensure duty belt

---

[2] Id.

     and gear are disinfected after contact with the arrestee.
- Don an approved and **fit-tested N-95 mask**
- Use a **face shield** that fully covers the front and sides of the face **or goggles** for eye protection
- Use **disposable non-sterile gloves.** Remove and put on new gloves for each new, symptomatic arrestee.
  - **Arrestee:**
    - Put on a disposable **surgical mask**
    - **Isolate in a single cell or negative air pressure cell**
  - **Contact** a healthcare professional for a further health evaluation.
    - Use similar precautions during prisoner transport, Court productions, etc.

- **Court production of prisoners with flu-like/COVID-19 symptoms**
  - Prisoners with flu-like symptoms should not appear in Court.
  - If the Court mandates a production, screening and prisoner/personnel precautions are the same as described above. The District may request the assistance of POD Office of Medical Operations (OMO) staff to help explain to the Court public health concerns.
- **Prisoner movement in detention facilities affected by suspected or confirmed COVID-19**
  - Prisoner movement should not take place within 14 days after last exposure to a suspected/confirmed case OR if less than 24 hours have elapsed since symptom resolution (without medications), unless necessary for medical reasons.
  - While the USMS cannot mandate detention facilities follow CDC clinical management guidance, correctional and detention facilities are strongly encouraged to follow it.
- **Reporting of suspected and/or confirmed COVID-19 cases**
  - Districts should report information regarding quarantines of USMS prisoners with suspected or confirmed COVID-19 disease to POD/OMO staff at (703) 740-8417 and include the following information:
    - Name of detention facility,
    - Number of prisoners affected (either ill or in quarantine), and
    - Number of individual facility housing units closed to prisoner movements.
- **If staff develop** symptoms of a lower respiratory illness (e.g., fever, cough, chills, body aches, sore throat, headache, diarrhea, nausea/vomiting, and runny nose) within 14 days of encountering a prisoner with risk factors, they should be evaluated by their healthcare provider immediately and before returning to work.

6. <u>Measures Taken By Northeast Ohio Correctional Center</u>

The defendant is currently housed at the NOCC which has set in place the following measures, in response to the COVID-19 outbreak:

- Implemented current guidelines from the CDC and World Health Organization for COVID-19 at all CoreCivic facilities
- Revised policies and procedures to include best practices for the prevention and handling of novel coronavirus
- Purchased COVID-19 testing kits
- Communicated best practices for personal hygiene to prevent the spread of the disease
- Urged employees to stay home if they are ill and expanded PTO policies for sick employees or those caring for ill family members
- Developed plan to separate high-risk individuals in our care who are more susceptible to COVID-19
- Worked closely with our government partners to suspend visitation at facilities as necessary
- Secured additional stores of personal protective equipment.[3]

As demonstrated above, extensive measures have been adopted and set in place to protect the defendant and other inmates from the spread of COVID-19.  In contrast, the Defendant argues that despite these measures his rights are jeopardized because they have complicated "arranging various experts to evaluate him."  However, despite this allegation, he gives no detail of those difficulties; what the process for an in-custody evaluation was before the COVID-19 policies were added, versus those in place now; how the new policies have demonstrably affected him; or what steps have been taken to work with NOCC.

7. Releasing Defendant Would Place An Undue Burden on Probation and Pretrial Services Officers

Defendant has asked to be released on a combination of conditions that would allow him to be released into the community.  While he argues that doing so will reduce his risk of contracting COVID-19, the defendant fails to acknowledge the increased risk that his release would pose to Probation and Pretrial Services Officers.  Supervising officers will have to

---

[3] https://www.corecivic.com/hubfs/_files/CoreCivic%20Response%20to%20COVID-1.pdf

conduct an intake interview, visit a home or homes, and monitor the defendant's release. This will require them to enter the community and have regular interactions with Defendant and others at a time when "The Centers for Disease Control and Prevention and other public health authorities have advised the taking of precautions to reduce the possibility of exposure to the virus and slow the spread of the disease. The Governor of the State of Ohio has additionally issued a 'Stay at Home' Order." Amended General Order 2020-05-1, In re: CORONAVIRUS (COVID-19) PUBLIC EMERGENCY (amending General Order 2020-05 on March 23, 2020). Given the strict protocols put in place by the U.S. Marshals and the Northeast Ohio Correctional Center, there is no reason to believe releasing the defendant would reduce his exposure to COVID-19. His release *would*, however, increase the exposure of supervising officers to COVID-19.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's motion and order his continued detention pending trial.

Respectfully submitted,

JUSTIN E. HERDMAN
United States Attorney

By: /s/ Duncan T. Brown
Duncan T. Brown (NY: 3982931)
Assistant United States Attorney
United States Court House
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3933
(216) 522-7499 (facsimile)
Duncan.Brown@usdoj.gov